FILED

## IN THE UNITED STATES DISTRICT COURT
### FOR THE EASTERN DISTRICT OF VIRGINIA
#### Alexandria Division

2011 DEC -5 P 2: 09

CLERK US DISTRICT COURT
ALEXANDRIA, VIRGINIA

| | |
|---|---|
| **ERIK B. CHERDAK** : | |
| : | |
| **Plaintiff,** : | |
| : | CASE NO. 1:11CV1311 - LO/JFA |
| **v.** : | |
| : | **COMPLAINT FOR** |
| **CURTIS A. VOCK** (an individual) : | **PATENT INFRINGEMENT,** |
| : | **DECLARATORY RELIEF, AND** |
| **and** : | **VIOLATION OF THE SHERMAN** |
| : | **AND CLAYTON ANTITRUST ACTS** |
| **PHATRAT TECHNOLOGY, LLC** : | |
| : | |
| **and** : | |
| : | |
| **NIKE, INC.** : | |
| : | |
| **and** : | |
| : | |
| **APPLE, INC.** : | |
| : | |
| **Defendants.** : | |

## COMPLAINT

PLAINTIFF, Erik B. Cherdak ("CHERDAK"), by and through counsel Ward & Ward,

PLLC, states the following as his Complaint against CURTIS A. VOCK ("CURTIS VOCK" or

"VOCK"), PHATRAT TECHNOLOGY, LLC ("PHATRAT"), NIKE, INC. ("NIKE"), and

APPLE, INC. ("APPLE") collectively referred to herein as DEFENDANTS:

## PARTIES

1.      CHERDAK is an individual who resides at 149 Thurgood Street in Gaithersburg,

Maryland 20878.  At all times relevant herein, PLAINTIFF has been and is the named inventor

in U.S. Patent No. 5,452,269 ("'269 Patent," or "Cherdak '269 Patent"), which was duly and legally issued by the U.S. Patent and Trademark Office ("USPTO") on September 19, 1995, and is entitled "Athletic Shoe with Timing Device." At all times relevant herein, PLAINTIFF has been and is the named inventor in U.S. Patent No. 5,343,445 ("'445 Patent," or "Cherdak '445 Patent"), which was duly and legally issued by the USPTO on August 30, 1994 and is entitled "Athletic Shoe with Timing Device." The Cherdak '445 Patent and the Cherdak '269 Patent shall be collectively referred to herein as "the Cherdak Patents."

2.    On information and belief, Defendant CURTIS A. VOCK is an individual who resides at 3165 10th Street, Boulder, Colorado, 80304 and is a Partner at the law firm of Lathrop & Gage, LLP, located at 4845 Pearl East Circle, Suite 201, Boulder, Colorado 80301. On further information and belief, VOCK regularly and continuously conducts business in the Commonwealth of Virginia.

3.    On information and belief, Defendant PHATRAT TECHNOLOGY, LLC is a Colorado Limited Liability Company, located at 4845 Pearl East Circle, Suite 300, Boulder, CO 80301. The Colorado Secretary of State reports an additional address for PHATRAT of 10437 Goosehaven, Lafayette, CO 80026. The Colorado Secretary of State also reports that VOCK is the primary contact for PHATRAT. PHATRAT owns and operates a website that is accessible to citizens of Virginia.

4.    Defendant NIKE, INC. is an Oregon corporation, having its principal place at 1 Bowerman Drive, Beaverton, Oregon 97005. NIKE manufactures, markets, distributes and sells infringing athletic shoes and related products, accessories, and product lines (including but not limited to, the NIKE+ Sport Kit, the NIKE+ compatible iPhone™ 3GS, 4, and 4S, the NIKE+ compatible iPod™ Touch™, the NIKE+ Sensor, shoe sensors, APPLE iPod® and iPhone®

2

transceivers, and wireless wristband transceivers ("NIKE+ SPORTSBAND")), through its network of retailers and its Internet website www.nike.com ("NIKE website"), throughout the United States and, in particular, in this judicial district of Virginia. The products described in this paragraph shall be collective referred to herein as the "NIKE+ products" or "NIKE PLUS products."

5.     Defendant APPLE, INC. is a California corporation with its principal place at 1 Infinite Loop, Cupertino, California 95014. On information and belief, APPLE is in a business relationship and acts in concert with NIKE to manufacture, market, sell and distribute the NIKE+ products. Defendant APPLE offers and sells NIKE+ products through retail stores and its website www.apple.com ("APPLE website") to parties throughout the United States and, in particular, in this judicial district of Virginia.

## JURISDICTION AND VENUE

6.     This Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 1338 and 1400 because the case or controversy arises out of a federal law.

7.     This Court has jurisdiction to issue a declaratory judgment pursuant to 28 U.S.C. §§ 2201-2202. 28 U.S.C. § 2201 provides this Court with jurisdiction to declare the rights and other legal relations of Plaintiffs and Defendant, and 28 U.S.C. § 2202 provides this Court with jurisdiction to grant further relief based on that declaratory judgment after reasonable notice and hearing.

8.     This Court has jurisdiction to hear Plaintiff's claim for violation of the Sherman and Clayton Antitrust Acts under §§ 2, 4 of those Acts (15 U.S.C. Ch. 1 §§ 2, 15) and in

3

accordance with *Walker Process Equipment, Inc. v. Food Machinery and Chemical Corp.*, 382 U.S. 172 (1965).

## NATURE OF THE CASE

9.      This is an action, *inter alia*, for Patent Infringement of U.S. Patent Nos. 5,343,445 and 5,452,269 to Cherdak under the Laws of the United States of America and, in particular, under 35 U.S.C. § 271.

10.      This action also includes a Count for Declaratory Relief in which Plaintiff seeks a Declaratory Judgment by the Court that U.S. Patent Nos. 5,636,146 and 5,960,380 and any and all patents claiming priority, in whole or in part, to the '146 and/or the '380 patents are INVALID as improperly obtained from the USPTO.

11.      This action also includes a claim for violation of Section 2 of the Sherman Antitrust Act, as permitted by Section 4 of the Clayton Act and in accordance with *Walker Process Equipment, Inc. v. Food Machinery and Chemical Corp.*, 382 U.S. 172 (1965).

12.      NIKE and APPLE, either individually and/or in concert, are each presently and have in the past engaged in the design, importation, distribution, sale, and offering for sale of athletic shoes and related and paired technologies and products including, but not limited to, those which incorporate technologies covered by the Cherdak Patents.

13.      At all times relevant herein, Defendants have engaged in the infringement of, induced the infringement of, and/or committed contributory infringement of the Cherdak Patents throughout the United States and, in particular, in this judicial district.

14.      DEFENDANTS, individually and/or in concert, have engaged and/or continue to engage in inequitable conduct before the USPTO in securing, *inter alia*, the issuance of a portfolio of patents including, but not limited to, U.S. Patents No. 5,636,146 and 5,960,380

4

("'146 Patent" and "'380 Patent," respectively) both to Flentov, *et al*. and/or all "follow-on" U.S. and foreign counterpart patents that base their "priority of invention" date back to November 21, 1994 by express reliance on either the '146 or '380 patents, or both.[1]

## FACTUAL BACKGROUND

15.     On or about July 6, 1993, PLAINTIFF filed a patent application entitled "Athletic Shoe with Timing Device," which resulted in the issuance of the U.S. Patent 5,343,445 on August 30, 1994.

16.     On August 29, 1994, PLAINTIFF filed a continuation-type application also entitled "Athletic Shoe with Timing Device" which resulted in the issuance of the U.S. Patent No. 5,452,269 on September 19, 1995.

17.     The Cherdak patents successfully underwent expert review by the USPTO on two occasions: first, in the early 1990's during initial examination proceedings and later during *ex parte* reexamination proceedings in 2007-2008.

18.     The reexamination proceedings resulted in the confirmation of many claims of the Cherdak patents without amendment.

19.     The Cherdak Patents are attached hereto with their re-examination certificates as **Exhibits 1-4**. The Cherdak Patents cover, *inter alia*, shoes and related products like those used, made, imported, and sold by NIKE and APPLE throughout their vast distribution networks.

20.     The NIKE+ IPOD product line has been an extremely successful consumer product offering.

---

[1]NIKE and APPLE may contend that they too have been victims of fraud by acquiring the Flentov et al. patents in the first place. Notwithstanding, a fraudulently obtained patent, and any other patents relying thereon for priority of invention, must fail as invalid when there has been egregious inequitable conduct.

21.   On information and belief, APPLE is expected to sell over 80,000,000 iPhones incorporating NIKE+ technology in 2011 alone. In addition, APPLE is also sells iPods, NIKE+ Sports Kits, NIKE+ Sportsband, and a host of other products incorporating NIKE+ IPOD technologies.

22.   On October 21, 2011, Defendant NIKE advertised over 70 shoe styles directly configured and sold for infringing purposes for use with NIKE+ technology.[2]

23.   NIKE and APPLE, either individually or jointly, have in the past imported, distributed, sold and offered for sale, and continue to import, distribute, market, sell and offer for sale, infringing athletic shoes and related and paired products, such as those bearing the "NIKE+" trademark.

24.   NIKE and APPLE have had full knowledge of the Cherdak Patents since before introducing, manufacturing, marketing, distributing, offering and selling infringing products, including but not limited to NIKE+ products and those products which are sold by DEFENDANTS to operate and/or pair with other NIKE+ products, in the marketplace.

25.   Despite their actual knowledge of the Cherdak Patents, NIKE and APPLE have engaged in a willful infringement campaign without respecting PLAINTIFF'S valid patent rights.

26.   NIKE and APPLE both continue to seek and procure patents directed to their personal fitness and monitoring technologies and products (like and similar to the NIKE+ products) and, in so doing, continue to reference and rely on the Cherdak Patents to make out alleged enabling disclosures for their own alleged inventions. *See e.g.*, U.S. Patent No. 8,036,051 to VOCK, et al. issued October 11, 2011 (expressly mentioning in the SUMMARY

---

[2] A discussion of NIKE+ technology is included in **Exhibit 5.**

OF THE INVENTION section thereof that U.S. Patent 5,343,445 to Cherdak provides "useful information" to teach those of ordinary skill in the art how to make and use the invention allegedly developed by VOCK, *et al*.).

27.     NIKE and APPLE have licensed (or otherwise acquired) either alone or collectively certain patents originally issued by the USPTO to PHATRAT.

28.     All patents based on PHATRAT's '146 and '380 patents were filed more than over one year after the priority date of the Cherdak '445 and '269 patents.

29.     On information and belief, PHATRAT either licensed or assigned ownership and/or rights in its invalid patent assets to either or both of APPLE and NIKE after PHATRAT first sued NIKE and APPLE based on NIKE's and APPLE's alleged infringement of PHATRAT's knowingly invalid patents.

30.     During the proceedings leading to the issuance of the '146 and '380 patents, the applicants thereof (including VOCK, a patent attorney) made false and misleading statements about the Cherdak Patents in a fraudulent effort to win allowance for VOCK's late-to-post patent applications – the Cherdak Patents are the primary references on which the USPTO relied in rejecting the application giving rise to both the '146 and '380 patents. The '146 and '380 patents are attached hereto at **Exhibits 6-7**, respectively.

31.     By mischaracterizing the Cherdak Patents and their disclosures, and ignoring the plain and clear language of the specifications and claims of the Cherdak Patents (which form part of the Specification of the Cherdak Patents), in the '146 and '380 patent applicants, VOCK (and possibly others), defrauded the USPTO, the Patent Examiner, and the American People.

32.     As such, the '146 and '380 patent applicants deceived the USPTO and wrongly won the allowance of, *inter alia*, the '146 and '380 patents.

7

33. As shown in **Exhibit 8**, U.S. Patent 8,036,851 to VOCK, *et al.*, issued October 11, 2011, bases its priority of invention date back to VOCK's original root patent – the '146 Patent.

34. VOCK's and PHATRAT's inequitable conduct either was known or reasonably should have been known to NIKE and APPLE during their due diligence of their business dealings with PHATRAT and its owners (including VOCK).

**COUNT I – PATENT INFRINGEMENT**
**THIS COUNT IS ANSWERABLE BY DEFENDANTS NIKE AND APPLE ONLY[3]**

35. All preceding and subsequent paragraphs are hereby incorporated by reference as though completely set forth herein.

36. Given the validity and enforceability of the Cherdak '445 and '269 patents as well as their corresponding Reexamination Certificates (**Exhibits 1-4**), Plaintiff Cherdak has the absolute right to seek redress against past, present, and future infringing acts as prohibited under the U.S. Patent Act (35 USC § 1, *et seq.*).

37. Cherdak possesses the right to pursue claims against, *inter alia*, the Defendants for their past, present, and future design, use, manufacture, importation, sale, offer for sale, and distribution of infringing products under 35 USC § 271(a), (b), and (c). In particular, Defendants, either alone or jointly, have acted (and continue to act) in concert to infringe the valid and enforceable claims of the Cherdak patents.

38. NIKE has infringed, contributed to the infringement of, and/or induced the infringement of the Cherdak Patents in violation of 35 USC § 271(a), (b), and (c) by their design,

---

[3] On information and belief, Defendant PHATRAT has expressed its intention to manufacture and/or market its own line of products allegedly covered by its invalid patents. *See* **Exhibit 20**. Investigation of PHATRAT's planned product offering is ongoing and, accordingly, Plaintiff reserves the right to amend his Complaint to have PHATRAT answer this COUNT I after due and proper discovery in this case.

use, manufacture, importation, distribution, sale, and offer for sale and inducement to sell athletic shoes and related products currently sold under or with the "TRIAX" trademark including, but not limited to, products known and marketed as the Triax Elite HRM/SDM, Triax CV-10, Triax V-10, SDM Triax 100, SDM Tailwind and MP3 Run products. The NIKE TRIAX SDM Tailwind single-shoe product is shown in **Exhibit 9** (which also shows the NIKE+ Sportsband Product).

39.     Defendants have infringed, contributed to the infringement of, and/or induced the infringement of the Cherdak patents in violation of 35 USC § 271(a), (b), and (c) by their design, use, manufacture, importation, distribution, sale, and offer for sale and inducement to sell athletic shoes and related products currently sold under or with the "NIKE+" trademark.

40.     Defendants have infringed, and continue to infringe, the Cherdak patents in violation of 35 USC § 271(b) by actively inducing distributors, customers, and/or retailers to infringe. By way of example and not limitation, Defendant APPLE states "Thanks to a unique partnership between NIKE and APPLE, your iPod [and iPhone, etc.] becomes your coach." **Exhibit 10**. NIKE states, *inter alia*, "Combine the Nike + iPod Sport Kit with your Nike+ ready shoes and an iPod Nano® mobile digital device to track your runs while you listen to music. The kit contains a waterproof, durable Nike+ sensor that fits inside your shoe, as well as a receiver that connects to your iPod nano**." Exhibit 11.**

41.     NIKE and APPLE have made and continue to make (and/or have had made on their behalf) infringing athletic shoes and related and paired products. They have and continue to market the same throughout the U.S. and, in particular, in this judicial district, for infringing purposes as is illustrated and marketed on the www.nikeplus.com website.

9

42.     Because of the subjectively willful nature of Defendants' infringing activities in violation of 35 USC § 271 and given what appear to be continued frauds on the USPTO to seek allowances for patents Defendants know are invalid, Plaintiff is entitled to enhanced damages of no less than trebled damages as permitted by the U.S. Patent Act (35 USC § 1, *et. seq.*), along with attorneys fees and costs of suit.  Such frauds on the patent office amounting to inequitable conduct give rise to this case being deemed "exceptional," thereby justifying the enhancement of damages.

### COUNT II -- DECLARATORY JUDGMENT OF PATENT INVALIDITY
### THIS COUNT IS ANSWERABLE BY ALL DEFENDANTS[4]
### The Entire VOCK Patent Family is Invalid Due to Inequitable Conduct

43.     All preceding and subsequent paragraphs are hereby incorporated by reference as though completely set forth herein.

44.     This is an action for Declaratory Judgment of Invalidity of U.S. Patent Nos. 5,636,146, 5,960,380, and all other U.S. Patents that base priority in whole or in part on U.S. Patent No. 5,636,146 and/or U.S. Patent 5,960,380 (including, but not limited to, USP 6,499,000 (bases priority on USP 5,636,146), USP 6,885,971 (bases priority on USPs 5,636,146 and 5,960,380), USP 6,963,818 (bases priority on USPs 5,636,146 and 5,960,380), and USP 7,092,846 (bases priority on 5,960,380)) in view of the egregious frauds and inequitable conduct committed by, *inter alia*, Defendants VOCK and PhatRat before the USPTO. Such conduct includes egregious false and misleading statements made directly by Co-Inventor and Patent

---

[4]VOCK is only one of the three (3) named co-inventors of the subject matter claimed in U.S. Patent Nos. 5,636,146 and 5,960,380 and a portfolio of follow-on patents claiming priority back to the filing dates of the '146 and '380 patents (November 21, 2011).  Plaintiff reserves the right to amend his complaint after due and proper discovery to include, *inter alia*, VOCK's co-inventors Flentov and Darcy.  On information and belief, Mr. Darcy is a Patent Agent registered to practice before the USPTO and either knew or should have known that Defendant VOCK's comments about Plaintiff's patents during examination of the '146 and '380 patents were material to the patentability of the inventions claimed in the '146 and '380 patents.

Attorney Curtis A. VOCK during the initial examination proceedings related to the '146 and '380 patents and the perpetuation of such inequitable conduct for years after the filing of the '146 and '380 patents.

45.   On information and belief, the following U.S. patents are owned by, have been owned by, or have been licensed in or out by Defendants and must be held invalid and unenforceable due to inequitable conduct[5]:

| 1 | 6499000 | System and method for determining loft time, speed, height and distance |
| | | The invention detects loft time and/or speed during activities of moving and jumping. A loft sensor utilizes a spectrum of information to detect leaving the ground and returning to the ground. A... |
| 2 | 6496787 | Apparatus and method for determining loft time and speed |
| | | The invention detects loft time and/or speed of a vehicle and/or person during activities of moving and jumping. A loft sensor detects leaving the ground and returning to the ground. A... |
| 3 | 6266623 | Sport monitoring apparatus for determining loft time, speed, power absorbed and other factors such as height |
| | | The invention detects the loft time and/or speed of a vehicle, such as a sporting vehicle, during activities of moving and jumping. A loft sensor detects when the vehicle leaves the ground and when... |
| 4 | 6516284 | Speedometer for a moving sportsman |
| | | The invention detects loft time and/or speed of a vehicle and/or person during activities of moving and jumping. A loft sensor detects leaving the ground and returning to the ground. A... |
| 5 | 7457724 | Shoes and garments employing one or more of accelerometers, wireless transmitters, processors, altimeters, to determine information such as speed to persons wearing the shoes or garments |
| | | A shoe is improved by including: at least one accelerometer for generating acceleration signals and a processor configured to process the acceleration signals to determine one or both of speed and... |
| 6 | 7623987 | Shoes and garments employing one or more of accelerometers, wireless transmitters, processors, altimeters, to determine information such as speed to persons wearing the shoes or garments |
| | | A shoe is improved by including: at least one accelerometer for generating acceleration signals and a processor configured to process the acceleration signals to determine one or both of speed and... |
| 7 | 7158912 | Mobile GPS systems for providing location mapping and/or performance data |
| | | A location measurement system comprises: a GPS receiver for attachment to a person and for determining earth location of the person; a display for attachment to the person; memory for storing map... |

[5] There may be patent applications (and patents) that are held by one or more Defendants (either solely or collectively) which are currently pending before the U.S. Patent Office and/or have been issued by the USPTO. Due discovery in this case will reveal all such patent applications and patents. Plaintiff reserves the right to amend his Complaint to specify all such applications and patents.

| 8 | 7949488 | Movement monitoring systems and associated methods<br>Systems and methods are disclosed that monitor movement of a person, or of a vehicle ridden by the person, to determine speed, distance traveled and/or airtime of the person or vehicle.... |
|---|---------|---|
| 9 | 6963818 | Mobile speedometer system and associated methods<br>The invention detects loft time and/or speed of a vehicle and/or person during activities of moving and jumping. A loft sensor detects leaving the ground and returning to the ground. A... |
| 10 | 7072789 | Systems for assessing athletic performance<br>Sensors detects loft time, speed, power and/or drop distance of a vehicle and/or person. The sensors couple with multiple persons during athletic activity. Data from the sensors downloads to a... |
| 11 | 6885971 | Methods and systems for assessing athletic performance<br>The invention detects the loft time, speed, power and/or drop distance of a vehicle, such as a sporting vehicle, during activities of moving and jumping. A loft sensor detects when the vehicle... |
| 12 | 7433805 | Pressure sensing systems for sports, and associated methods<br>A system determines athletic performance. A pressure sensor senses change in elevation. A microprocessor processes signals from the pressure sensor to determine speed corresponding to the change in... |
| 13 | 7813887 | Location determining system<br>A location measurement system comprises: a GPS receiver for attachment to a person and for determining earth location of the person; a display for attachment to the person; memory for storing map... |
| 14 | 7983876 | Shoes and garments employing one or more of accelerometers, wireless transmitters, processors altimeters, to determine information such as speed to persons wearing the shoes or garments<br>A shoe is improved by including: at least one accelerometer for generating acceleration signals and a processor configured to process the acceleration signals to determine one or both of speed and... |
| 15 | 7693668 | Impact reporting head gear system and method<br>A system for determining airtime of a moving sportsman includes at least one accelerometer for detecting vibration or acceleration of the sportsman. A processor in communication with the at least... |
| 16 | 7991565 | System and method for non-wirelessly determining free-fall of a moving sportsman<br><br>A system for determining airtime of a moving sportsman includes at least one accelerometer for detecting vibration or acceleration of the sportsman. A processor in communication with the at least... |
| 17 | 7860666 | Systems and methods for determining drop distance and speed of moving sportsmen involved in board sports<br>A system for determining airtime, speed and/or drop distance of a moving sportsman includes at least one accelerometer for detecting vibration or acceleration of the sportsman and/or a GPS unit. A... |
| 18 | 7966154 | Pressure sensing systems for sports, and associated methods<br>A system determines athletic performance. A pressure sensor senses change in elevation. A microprocessor processes signals from the pressure sensor to determine speed corresponding to the change in... |
| 19 | 7640135 | System and method for determining airtime using free fall<br>A system for determining airtime of a moving sportsman includes at least one accelerometer for detecting vibration or acceleration of the sportsman. A processor in communication with the at least... |
| 20 | 5960380 | Apparatus and methods for determining loft time and speed<br>The invention detects the loft time and/or speed of a vehicle, such as a sporting vehicle, during activities of moving and jumping. A loft sensor detects when the |

| | | vehicle leaves the ground and when... |
|---|---|---|
| 21 | 6539336 | Sport monitoring system for determining airtime, speed, power absorbed and other factors such as drop distance |
| | | The invention detects the loft time, speed, power and/or drop distance of a vehicle, such as a sporting vehicle, during activities of moving and jumping. A loft sensor detects when the vehicle... |
| 22 | 6498994 | Systems and methods for determining energy experienced by a user and associated with activity |
| | | A method is disclosed for evaluating shoes worn by a person for activity on ground, including the steps of determining forces of acceleration experienced by the person in a direction generally... |
| 23 | 6959259 | System and methods for determining performance data |
| | | The invention determines performance data during activity of a person. A microprocessor and a sensor, such as a GPS sensor, attach to the person or to a vehicle ridden by the person. The sensor and... |
| 24 | 7092846 | Systems and methods for determining performance data |
| | | The invention determines performance data during activity of a person. A microprocessor and a sensor, such as a GPS sensor, attach to the person or to a vehicle ridden by the person. The sensor and... |
| 25 | 6856934 | Sport monitoring systems and associated methods |
| | | Methods and systems are disclosed for determining speed, power and/or impact (sporting characteristics) of persons involved in activity. Wireless signals may be generated indicative of the sporting... |
| 26 | 7054784 | Sport monitoring systems |
| | | Methods and systems are disclosed for determining speed, power and/or impact (sporting characteristics) of persons involved in activity. Wireless signals may be generated indicative of the sporting... |
| 27 | 7451056 | Activity monitoring systems and methods |
| | | An activity monitor, comprises housing for attachment to a person; at least one accelerometer disposed within the housing; and a processor disposed within the housing, for processing signals from... |
| 28 | 8036851 | Activity monitoring systems and methods |
| | | An activity monitor, comprises housing for attachment to a person; at least one accelerometer disposed within the housing; and a processor disposed within the housing, for processing signals from... |
| 29 | 7512515 | Activity monitoring systems and methods |
| | | An activity monitor, comprises housing for attachment to a person; at least one accelerometer disposed within the housing; and a processor disposed within the housing, for processing signals from... |
| 30 | 7386401 | Helmet that reports impact information, and associated methods |
| | | A system determines impact of a helmet. The helmet includes at least one accelerometer and a processor. The accelerometer detects acceleration of the helmet. The processor is configured to process... |
| 31 | 7162392 | Sport performance systems for measuring athletic performance, and associated methods |
| | | System determines impact of a helmet, comprising: accelerometer and processor, the accelerometer detecting acceleration of the helmet, the processor configured to process the signals from the... |

46.    An actual case or controversy exists between the Plaintiff and Defendants as to the validity of the U.S. Patents mentioned herein because VOCK personally made, with deceptive intent, materially false and misleading statements to the USPTO regarding the Cherdak Patents.

47.    Such materially false statements were made with the specific intent to deceive and mislead the USPTO into wrongly and erroneously issuing, *inter alia*, the '146 and '380 patents and have and continue to injure Plaintiff by unduly creating obstacles preventing Plaintiff from fully enjoying his valid and enforceable patent rights[6]. VOCK's statements made during the prosecution of his '146 and '380 patents, years after Cherdak's patents had been validly issued as U.S. Patents, have frustrated licensing efforts by Plaintiff and have caused Plaintiff to incur great expense defending frivolous assertions stemming from the falsehoods asserted by VOCK to the USPTO in his capacities as a Co-Inventor named in the '146 and '380 patents, as principal of PhatRat, and as in his capacity as a Patent Attorney[7] before the U.S. Patent and Trademark Office.

48.    Such falsehoods and frauds on the patent office by VOCK and PhatRat have caused delay, lost opportunity and lost profits to Plaintiff in the patent licensing marketplace, where Plaintiff directly competes with VOCK and PhatRat. Furthermore, VOCK and PhatRat have created significant barriers to entry preventing Plaintiff Cherdak from fully enjoying the benefits of valid and enforceable patent rights such as partnering with companies to use, make and sell

---

[6]Because of the false and misleading statements made by VOCK during the prosecution of his '146 and '380 patents, Defendant Rack Room (represented by Lathrop & Gage, VOCK's law firm) in the case styled *Cherdak v. Rack Room* (E.D.Va. Case No. 11-cv-169) has asserted arguments which are false, misleading and based on material misrepresentations made by VOCK many years earlier. Plaintiff has incurred significant litigation expenses defending against unreasonable arguments made by Lathrop & Gage.

[7]VOCK is a Lathrop & Gage Partner. *See* **Exhibit 12**. On information and belief, Lathrop & Gage represented both Defendant VOCK and PhatRat before the USPTO in connection with VOCK and PhatRat seeking U.S. Patents.

products like or similar to NIKE+ products.

49.   VOCK's and PhatRat's conduct mandates that a remedy be granted to Plaintiff in this case in accordance with equitable notions of unclean hands.

50.   VOCK's conduct during the initial examination proceedings related to the '146 and '380 patents gives rise to clear inequitable conduct.

51.   VOCK committed inequitable conduct by making materially false statements about the Cherdak Patents in order to overcome numerous prior art rejections based on the Cherdak '445 and '269 patents and with the requisite specific intent to deceive the USPTO into wrongly issuing VOCK's '146 and '380 patents.

52.   But for VOCK's materially false and misleading averments about Plaintiff's '445 and '269 patents, the USPTO would not and should not have issued the '146 and '380 patents.

53.   But for VOCK's false and misleading statements about the Cherdak '445 and '269 patents, VOCK would not have received allowances for patent claims that possess the very limitations about which he committed fraud on the patent office in the mid-1990s.

54.   Because VOCK's statements are patently false and are expressly stated in the record of the proceedings before the USPTO in connection with the '146 and '380 patents, the '146 and '380 patents and all patents that base (in whole or in part) their priority on the same must be held invalid and unenforceable due to VOCK and PhatRat's inequitable conduct.

55.   Because inequitable conduct renders an entire patent (and entire patent family) unenforceable, as a general rule, this doctrine must be applied in instances where the patentee's misconduct resulted in the unfair benefit of receiving an unwarranted patent claim.

56.   VOCK's misconduct about material facts in the prior art was deliberately, specifically, and expressly designed to deceive the USPTO into wrongly issuing the '146 and

'380 patents. It would be unfair to continue to allow Defendants to receive the benefit of their unwarranted patent claims and their priority date (albeit later than CHERDAK's).

57.   Defendants VOCK and PHATRAT's egregious misconduct is clear and direct from the records of the proceedings before the USPTO in the context of the '146 and '380 patents. Defendants ought not to be permitted any sort of deference for allegations of mistake or other excuse. Defendants must be stripped of their valuable (yet ill-gotten) patent rights. It is unfair to allow Defendants to reap the benefits of a patent monopoly when they have engaged in affirmative acts of egregious misconduct.

58.   And, the statements made by VOCK[8] to the USPTO to fraudulently win allowance for his invalid patent claims constitute affirmative acts of egregious misconduct warranting a "materiality" in addition to any but-for materiality.

59.   The facts set out *infra* with regard to Count III are incorporated herein by reference as if fully set forth in this Court II.

60.   Accordingly, Plaintiff is entitled to a judgment declaring that the '146 and '380 patents, and all patents relying on same for priority of invention, are invalid as a result of the inequitable conduct by Defendants.

---

[8]VOCK is a Registered Patent Attorney (Registration No. 38356).   Under 37 C.F.R. s. 1.56, VOCK (and anybody associated with the patents and claims he was pursuing) had an affirmative duty to disclose information material to patentability. 37 C.F.R. s. 1.56 ("Duty to disclose information material to patentability: (a) public interest. The public interest is best served, and the most effective patent examination occurs when, at the time an application is being examined, the Office is aware of and evaluates the teachings of all information material to patentability. Each individual associated with the filing and prosecution of a patent application has a duty of candor and good faith in dealing with the Office, which includes a duty to disclose to the Office all information known to that individual to be material to patentability as defined in this section.") Fraud on the patent office by a registered patent practitioner is misconduct under 37 C.F.R. § 10.23 (d) (A practitioner who acts with reckless indifference to whether a representation is true or false is chargeable with knowledge of its falsity. Deceitful statements of half-truths or concealment of material facts shall be deemed actual fraud within the meaning of this part.).

## COUNT III – ANTI-COMPETITIVE CONDUCT
### Under the Sherman (§ 2) and Clayton (§ 4) Antitrust Acts
### THIS COUNT IS ANSWERABLE BY ALL DEFENDANTS

### A. Defendants' Intentionally Fraudulent Procurement of a Vast Portfolio of Patents Renders Such Patents Invalid under the U.S. Patent Act

61.     All preceding and subsequent paragraphs are hereby incorporated by reference as though completely set forth herein.

62.     On information and belief, DEFENDANTS have secured a large number of U.S. and foreign patents which they use to embolden their market power and deter others from entering the personal fitness and activity monitoring marketplace. All of these patents claim, in one way or another, the benefit of priority of invention (the effective filing date) to two (2) patents knowingly procured by egregious fraud on the patent office. These two parent or "seed" patents, U.S. Patent Nos. 5,636,146 and 5,960,380 (**Exhibits 6 and 7**) are a parent patent and an immediate, next-inline continuation patent, respectively, in what is now a vast portfolio of ill-gotten patents obtained by the egregious frauds Defendant VOCK (and possibly others) committed on the U.S. Patent and Trademark Office in the mid-1990s.

63.     The primary inventor, Mr. Curtis VOCK, a patent attorney, a partner at Lathrop & Gage, named co-inventor, and principal at Defendant PhatRat, along with his co-inventors, in the mid-1990s engaged in fraud and/or continued to perpetuate such frauds on the USPTO by egregiously, intentionally and materially misrepresenting prior art references (the Cherdak '445 and '269 patents) asserted by the USPTO as negating patentability for the claims in the applications giving rise to the '146 and '380 patents.

64.     To the present day, and for almost 15 years, Defendants have enjoyed the fruits of their frauds and collusive activities to effectively rid the market of real, meaningful competitors and competition. As such, they can enjoy the ill-gotten rewards associated with the marketing of

one of the most successful consumer product launches in history – namely, the introduction, marketing, and sale of the NIKE+IPOD product line, including shoes, electronic devices, clothing, iPods, iPhones, and a whole array of products that piggy-back on the "NIKE+IPOD" (pronounced NIKE "PLUS" IPOD) product line, which has become a marketplace of its own.

65.    After the '146 and '380 patents were fraudulently obtained from the U.S. Patent Office, Defendants have continuously reaped millions of dollars in product-related revenue, patent royalty income and monies known only to those who are able to benefit from the wild marketing success of products similar to the NIKE+IPOD and who usually enjoy otherwise valid patents pursuant to the *Quid Pro Quo*[9] conferred by the United States Government to Patent holders.

66.    Defendants continue to profit as a result of their frauds before the USPTO, restraining free trade and commerce in the process. These actions are illegal under the Sherman and Clayton Acts.

67.    On November 21, 1994, VOCK, along with his co-inventors (and possibly others) set out to fraudulently obtain patents by filing their primary parent patent application – U.S. Patent Application No. 08/344,485 entitled "Apparatus and Methods for Determining Loft Time and Speed." (the "'485 Application")

68.    The '485 Application ultimately gave rise to the '146 patent. Currently, the '146 Patent forms the basis for a sizeable but tainted patent portfolio that includes a vast array of U.S. and Foreign Patents, Patent Applications and related rights.

69.    Unfortunately for Defendants, Plaintiff arrived at the USPTO first – long before VOCK and his co-conspirators filed their applications.

---

[9] Innovation and invention in exchange for a limited right to exclude others from making, using and selling a patented article or process. *See*, U.S. Constitution, Article I, Section 8, Clause 8.

70.     In fact, by the time VOCK, et al. arrived at the USPTO, Plaintiff Cherdak's U.S. Patents had been filed (as early as July 6, 1993), prosecuted, and <u>issued</u> by the USPTO as valid, enforceable patents on August 30, 1994 (USP 5,343,445), and September 19, 1995 (USP 5,452,269).

71.     VOCK's '485 patent application was filed on November 21, 1994, and remains the primary patent on which Defendant NIKE (and Defendant APPLE) still rely for purposes of priority to build their set of tainted patents by Fraud on the Patent Office. **Exhibit 8** (U.S. Patent No. 8,036,851 entitled "Activity Monitoring Systems and Methods" to VOCK et al. and issued on October 11, 2011, now assigned to Defendant APPLE).

72.     During the USPTO Examination Proceedings related to the '485 Patent Application giving rise to the '146 patent, Defendant VOCK made material misrepresentations about Plaintiff's patents in seeking allowance for the '146 patent.

73.     VOCK's material and false misrepresentations were deliberately made to deceive the USPTO into issuing the '146 patent in the first place.

74.     VOCK's direct involvement in the frauds is clear – he is a named co-inventor and a patent attorney and he signed the very papers that were submitted to the USPTO to further his frauds.

75.     <u>VOCK's fraudulent statements to the USPTO are material to the patentability of his claims in the '146 and '380 patents. But for such averments, the '146 and '380 patents would not have been issued by the USPTO in the first place</u>.

76.     On May 21, 1996, in attempting to overcome prior art rejections in VOCK's '485 Patent Application based on the Cherdak '269 patent under 35 U.S.C. § 102 (anticipation) and § 103 (obviousness), VOCK signed and submitted a "RESPONSE' on behalf of himself and his

co-inventors to an Office Action containing such rejections as mailed by the USPTO on November 22, 1995.   In that RESPONSE, VOCK began to intentionally and materially misrepresent the Cherdak '269 patent by stating:

> Cherdak, on the other hand, discloses a single embodiment of a "contact dimple," column 5, lines 13-14, for activating timing circuitry relative to an athletic shoe's substantially vertical movement off of the floor. A dimple is, by definition, "an indentation or depression on a surface," *see, e.g., Webster's Ninth College Dictionary*. Such a *dimple* is unsuitable *and* undesirable in accord with the present invention, where a vehicle's movement along the surface is critical to the sport. For example, in snowboarding, a dimple on the underside of the snowboard would cause undesirable speed losses and directional instability.

Office Action Response dated May 21, 1996 at pages 8-9 (**Exhibit 13**).

77.   Despite the USPTO's initial reluctance to accept VOCK's fraudulent statements, VOCK pushed on and would not take "no" for an answer.   On September 3, 1996, VOCK again wrote to the USPTO (and he signed a RESPONSE to a Final Rejection) and stated:

> More particularly, the amendment to claim 1, which incorporated the language "the loft sensor being substantially non-responsive to interfering engagement with the surface," was made in the last response of 6/4/96 **to overcome Cherdak '445**. This argument was rejected by the Examiner. Applicants will continue this argument in a continuing application that will be filed for the rejected claims 1-14, 18-22, 27, 29, 35-37 and 40-42. Therefore, claims 1-14, 18-22, 27, 29, 35-37 and 40-42 are hereby canceled.

Amendment after Final in Accord with 37 C.F.R. §1.116(a) dated September 3, 1996 at page 6 (**Exhibit 14**) (emphasis added) (the continuing application mentioned by VOCK ultimately became the '380 patent).

78.   In response to VOCK's Rule 1.116 After-Final Rejection Amendment and Response, the USPTO issued U.S. Patent 5,636,146.

79.   The statements made by VOCK in the papers he filed *pro se* in the USPTO on May 21, 1996 and September 3, 1996, such as his avowal to "continue" materially false misrepresentations of the prior art (the Cherdak patents), demonstrate VOCK's clear intent to

commit fraud on the USPTO by materially misrepresenting the prior art (the Cherdak '445 patent) to win allowance for his patents.

80.   On December 12, 1996, VOCK (and possibly others) filed a Continuation-type patent application in the USPTO bearing Serial No. 08/764,758, entitled "Apparatus and Methods for Determining Loft Time and Speed."

81.   The '758 patent application ultimately issued as the '380 Patent to Flentov, *et al*. **Exhibit 7** ('380 Patent).  In prosecuting the '758 application, VOCK did exactly as he said he avowed he would do, and he continued his false and materially misleading statements about the Cherdak '445 and Cherdak '269 Patents by stating:

> This is completely opposite to Cherdak, *which requires a protrusion* from the sneaker in order to operate. Such a protrusion would be completely inconsistent with the invention and its claims. **Specifically, <u>Cherdak only discloses a</u> single embodiment of a "contact dimple,"** column 5, lines 13-14, **for activating timing circuitry relative to a athletic shoe's substantially vertical movement off of the floor.**[10]  A dimple is, by definition, "an indentation or depression on a surface," *see, e.g., Webster's Ninth College Dictionary*. A dimple such as Cherdak is unsuitable and undesirable in accord with the present invention, where a vehicle's movement along the surface is critical to the sport. For example, in snowboarding, a dimple on the underside of the snowboard would cause undesirable speed losses and directional instability. Accordingly, Cherdak's recitation of a dimple as an activation switch[11] is suitable, only to athletic shoes, where a user's movement does not slide or otherwise move in contact with the floor. **<u>Note that the amendments state that the loft sensor determines air time in a manner which is substantially non-interfering with motion along the surface. Such a limitation clearly distinguishes over Cherdak.</u>**

---

[10] In *Cherdak v. Rack Room Shoes*, Case No. 11-cv-169, now pending in this Court, VOCK's law firm, Lathrop and Gage, has asserted that activation of certain embedded circuitry covered by the claims of the '445 patents, for example, only works when in contact with the floor – in direct contravention of VOCK's earlier averments to the USPTO and his recognition that the triggering devices disclosed in the Cherdak '445 patent activate the circuitry in the shoes relative to the shoe's substantially vertical movement off of the floor.  According to VOCK, Cherdak disclosed the activation of circuitry relative to an athletic shoe's substantially vertical movement off of the floor. **Exhibit 15** at 7.

[11] VOCK's assertion that a contact dimple is an activation switch is materially false.  The dimple discussed in one preferred embodiment was a formation on the bottom of a sneaker's sole – not part of the circuit triggering elements that are taught within the Cherdak patents.

'758 Patent Application at Response to Office Action dated February 20, 1998 at page 7 (**Exhibit 15**) (emphasis in original text). In VOCK's Response to the Office Action, VOCK turned up the heat on the Patent Examiner and the USPTO by going from a "discloses a single embodiment of a 'contact dimple," argument to a "**which requires a protrusion**" from the sneaker in order to operate. VOCK was wrong on the facts and his heightened approach toward the USPTO drove him to wholly mischaracterize the Cherdak patents and to aver that the Cherdak Patents "required" certain structure – shocking, false, misleading, and egregious misconduct done to get his patent issued regardless of the prior art.

82.   VOCK further fraudulently stated:

As discussed above, Cherdak describes only a sensor that is incorporated with the vehicle - an athletic shoe - as a housing and which extends via a dimple so that direct contact with the floor triggers the switch.

*Id.* at 9. and that:

As above, independent claim 41 is a method claim which is amended to include the limitation that the steps of sensing are to be non-interfering with the motion of the vehicle along the surface. **As argued above, Cherdak does not have such a sensor; and, as above, Applicants respectfully submit that claim 41 is allowable over the art.** Because claim 42 depends from claim 41, claim 42 is also allowable for the same reasons.

*Id.*

83.   VOCK materially misrepresented (and concealed) the facts in the Cherdak '445 and '269 patents regarding the contents and enabling disclosures therein in a direct attempt to make such willful misrepresentations appear official by citing to the Cherdak '269 Patent at Col. 5, by pointing only to one "embodiment" of a particular type of shoe and its sole, but **VOCK only cited to lines 13-14 at col. 5 of the '269 patent**[12].

---

[12] Patent Attorney VOCK's citation only to lines 13-14 at col. 5 of the '269 demonstrates an example of his deliberate concealment of material information and his intent to deceive the

84.   VOCK's truncated, "half-truth" type citation to the Cherdak patent was a clear affirmative act on his part to materially conceal and mislead the USPTO by mischaracterizing the prior art (the Cherdak patents) for the intended purpose of obtaining allowance of his '380 patent.

85.   An inspection of VOCK's truncated citations reveals that VOCK made a deliberate decision to withhold and conceal a known material reference (information within the Cherdak '445 patent).

86.   To set the record straight, the disclosure of a contact dimple as part of a shoe's sole in the discussion of a "preferred embodiment" in the Cherdak Patents was but one of many structural and operational arrangements, devices, switches, piezoelectric devices, motion, acceleration and pressure responsive devices disclosed in the specifications of the '445 and '269 patents.

87.   By way of example, as stated in the '269 patent and in regard to the many preferred embodiments disclosed therein, Mr. Cherdak clearly stated:

> While activation switch 4110 is preferably like that of the LA GEAR design other switching systems including contact switches, tape switches, pressure switches, and any other well know switching systems would also work in the present invention.

Cherdak '445 patent at col. 5, **lines 9-14**; same quote found in Cherdak '269 patent at col. 5, lines 18-23; *see also*, '269 patent at col. 2, lines 57-61 (emphasis supplied) (clearly referencing

---

USPTO to win allowance for his own patents. Lines 13-14 at col. 5 of the Cherdak '269 patent provides only an incomplete sentence fragment "...*GEAR's switch carrier resides is formed with a contact dimple which, when pressed upon contact of the shoe*..." deliberately taken out of context. Citation to such a sentence fragment is certainly the wrongful, deceitful conduct that 37 C.F.R. § 10.23 (d) seeks to prevent by patent attorneys by specifying the prohibition, *inter alia*, of "half-truths." 37 C.F.R. § 10.23 (d) governs the conduct of patent (attorney) practitioners and states that a "practitioner who acts with reckless indifference to whether a representation is true or false is chargeable with knowledge of its falsity. Deceitful statements of half-truths or concealment of material facts shall be deemed actual fraud within the meaning of this part."

piezo-electric devices as being known by those skilled in the art and which could be used in the

context of the inventions claimed by the Cherdak '445 and '269 patents.)[13] The USPTO also held

that the Cherdak '445 patent <u>teaches</u> that a "loft sensor" is one that may consist of, but not be

---

[13] The USPTO also held that the Cherdak '445 patent disclosure was broad enough to include many types of switching and sensor arrangements which pre-dated VOCK's alleged patentable inventions. The USPTO stated that the Cherdak '445 patent broadly disclosed switches in association with sensors which could be used to detect loft time and without interference of a switch with a ground surface. See **Exhibit 16** at page 8 (USP 5,636,146 Patent Prosecution at Office Action Mailed August 14, 1996). Accordingly, while a switch may be configured to produce a relatively narrow signal spectrum indicative of whether a shoe is off the ground and in the air or is on the ground, the USPTO understood that such sensors in association with switches were certainly disclosed in the Cherdak '445 patent. *Id.* Furthermore, the express mention of piezo-based devices in the '445 patent certainly teaches one of ordinary skill in the art that piezo-based devices, for example, can be used in an apparatus to detect, *inter alia*, loft time. Accordingly, a sensor (e.g., a piezo-based microphone or buzzer, strain-gauge, etc.) in association with other circuit components and devices were clearly understood by the USPTO as being covered and taught by the Cherdak '445 patent. *Id.* Consequently, the '445 patent certainly contemplates a circuit driving or triggering element that responds to a physical action (pressure or force over area) realized by a shoe and that causes the shoe to move and which causes the triggering element to generates a signal spectrum in response thereto. In the context of the NIKE+ products, Claim 1 of the '445 patent, for example, reads directly on the shoe sensor-iPod arrangement device in that the sensor senses pressures (forces over areas) imparted to the shoe when the same is lifted into the air during running (a series of jumps), and that senses pressures imparted to the shoe when the shoe returns to the ground and determines an amount of loft time there-between. The detection of loft time (the time that a shoe structure is off the ground and in the air during a jump), in say, USP 8,036,851 (naming VOCK as a co-inventor), clearly recognizes that the exact structure for determining such loft time is secondary to the function of determining loft time by sensor signal recognition by stating the equivalency among devices that produce signals ranging from relatively wider-spectrum analog signal generation devices (e.g., a microphone) to switches that produce relatively narrower or "discrete" signal spectrums similar to switches: "With reference to FIG. 1, the loft sensor 20 may be constructed by several well known components...Preferably, the sensor is either an accelerometer or a microphone assembly...Alternatively, the sensor 20 may be constructed as a mechanical switch that detects the presence and absence of weight onto the switch." USP 8,036,851 to VOCK, et al. at col. 11, lines 45-50 (<u>now assigned to Defendant APPLE</u>). The '851 patent describes the use of a switching component by further stating "In still another embodiment of the invention, the sensor 80 of FIG. 1 <u>can be a switch</u> that rests below the boot of the ski....and that senses pressure caused by the weight of the user within the boot...That is, when the skier is on the ground, the boot squeezes the switch, thereby closing the switch...**The closed switch is detected...as a discrete input**. *Id.* at col. 13, lines 56-end. One of ordinary skill in the art such as Plaintiff Cherdak certainly understands that a discrete input over time is one that certainly represents a spectrum of information (albeit relatively narrower than the signal generated over time by a microphone). Depending on how long a signal from a switch is detected or maintained, it matters not that a spectrum may contain only discrete values – a signal spectrum in this context is a signal representation occurring over time. Defendant VOCK furthered his fraud on the USPTO when he stated "**The microprocessor subsystem 12 will count at known time intervals (clock rates) for the duration of the opened switch, corresponding to the jump, and will record how long the jump lasts.**" A spectrum of signal values corresponding to open switch states at timed intervals will provide an equivalent signal generation arrangement that can be used to detect loft time. Defendant VOCK's patents are invalid due to fraud on the patent office, and they should not have been issued over the Cherdak '445 patent based on technical reasons as well. Interestingly, USP 8,036,851 to VOCK *et al.* issued on October 11, 2011, and relies on and incorporates by reference the Cherdak '445 patent to provide an enabling disclosure. '851 Patent at col. 2, lines 20-25 (the '445 patent is the No. 1 patent relied on and incorporated by reference by Mr. VOCK and his co-inventors).

limited to, (i) an accelerometer that senses a vibrational spectrum; (ii) a microphone assembly that senses a noise spectrum; (iii) a switch that is responsive to a weight of a user of a vehicle, (iv) a voltage-resistance sensor that generates a voltage indicative of the speed of a vehicle; and (v) a plurality of accelerometers connected for evaluating a speed of a vehicle. *See* **Exhibit 21** at Office Action page numbered "6." (USPTO Office Action in which the USPTO holds that claim 13 of the patent application corresponding to the '380 patent to Flentov et al, was unpatentable under 35 U.S.C. § 103, because the Cherdak '445 patent the aforementioned group devices – switches, voltage-resistence sensors, accelerometers, a plurality of accelerometers, and a microphone). Despite the Patent Examiner's position, VOCK pushed on by continuing to berate the Patent Examiner into falsely believing his sole "dimple" argument.   VOCK's statements about a contact dimple were totally false, misleading, and egregious and were designed to deceive the Patent Examiner, the USPTO, and the American People. VOCK's express false and misleading statements are direct evidence of his intent to deceive the USPTO and were, by definition, material to the patentability of claims he was hotly pursuing in the USPTO.

88.    Nonetheless, VOCK pushed even harder by further falsely characterizing the prior art (the Cherdak patents) by attacking the methods contemplated by the Cherdak patents when he stated:

> As above, independent claim 41 is a method claim which is amended to include the limitation that the steps of sensing are to be non-interfering with the motion of the vehicle along the surface. <u>As argued above, Cherdak does not have such a sensor; and, as above, Applicants respectfully submit that claim 41 is allowable over the art</u>. Because claim 42 depends from claim **41,** claim 42 is also allowable for the same reasons.

*Id*. (emphasis supplied).  The Cherdak patents certainly disclosed sensors later disclosed by VOCK and his co-inventors in his late-to-file patent applications giving rise to his ill-gotten '146 and '380 patents.

89.   On June 1, 1999, the Patent Examiner issued a Notice of Allow ability in the '380 patent file then-pending before the USPTO.

90.   The Patent Examiner and the USPTO indicated their direct reliance on VOCK's fraudulent and inequitable averments in the USPTO's REASONS FOR ALLOWANCE by stating:

> "Claims 1-12, 18-22, 29, 35 and 36 are allowable over the prior art because the prior art does not disclose or suggest *the combination of the following features*: a loft sensor for sensing a first condition that is indicative of a vehicle, the vehicle of the type which is ridden along a surface by a user of the vehicle, leaving the surface, and a second condition indicative of the vehicle returning to the surface, **the loft sensor being constructed and arranged so as to be substantially non-interfering with motion of the vehicle along the surface,** wherein the loft sensor senses a spectrum of information and wherein the first and second conditions correspond to a change in the spectrum of information; and a microprocessor subsystem for determining a loft time that is based on the first and second conditions, wherein the microprocessor subsystem comprises means for interpreting the change in the spectrum to determine the loft time."

**Exhibit 17** at page 2 (emphasis supplied) (USPTO Notice of Allowability Mailed June 1, 1999).

91.   BUT FOR VOCK's false and misleading statements to the USPTO and his endless pressuring of the Patent Examiner, the USPTO would not have wrongly found allowable subject matter in VOCK's then-pending patent applications giving rise to the '146 and '380 patents and, more particularly, in the "combinations" claimed therein. VOCK "spoke" with the authority of a registered patent attorney to give the impression of being an expert – unfortunately for VOCK, he was wrong and he knew it.

92.   BUT FOR VOCK asserting such false and misleading comments such as "Cherdak only discloses a single embodiment of a 'contact dimple', column 5, lines 13-14, for activating timing circuitry relative to a athletic shoe's substantially vertical movement off of the floor," the USPTO would not have allowed the '380 patent to issue in the first place.

93.   VOCK knew that his statements were false and material to patentability of his patent claims as directly evidenced by the claims issuing in the '380 patent. For example, claims

of the '380 contain the very features VOCK argued as distinguishing his alleged invention over the Cherdak patents.

94.    VOCK made deliberate and material misrepresentations about the Cherdak patents to secure his own patents. *See e.g.*, '380 Patent at Claim 1 defining VOCK's combination as one that includes a loft sensor like Plaintiff's, which is "constructed and arranged so as to be substantially non-interfering with motion of the vehicle along the surface." **Exhibit 8** at Claim 1.

95.    In fact, Plaintiff's loft sensor doesn't interfere with a vehicle's movement along any surface, as it was described as being embedded within a shoe. See '445 Patent (**Exhibit 1**) at Claim 22, for example (**Exhibit 1** at Claim 22). Any mention of a contact dimple was part of a shoe's sole member, not in any way forming part of a circuit element used to trigger apparatus operation.

96.    VOCK knowingly made material misrepresentations to the Patent Examiner, the USPTO, and, indeed, to the American Public. In so doing, VOCK improperly frustrated the very competition which patents are intended to promote and protect.

97.    In *Cherdak v. Rack Room Shoes, Inc.* (Case No. 11-cv-169), currently pending in this Court, Lathrop & Gage (VOCK's law firm) demonstrated the frauds committed by VOCK, beginning with the prosecution of the '146 patent.

98.    In a Summary Judgment Motion filed by Defendant Rack Room and signed by a Lathrop & Gage attorney, (which was denied by the Court *sua sponte* without any responsive briefing being required by Plaintiff Cherdak in that case), Lathrop & Gage attorneys stated that "[a]lthough the '445 patent states that the activation switch is preferably like that of the LA GEAR design, it [the '445 patent] also notes that other well-known switching systems, such as

contact switches and tape switches could be used as well."[14] *See* Case No. 11-cv-169, ECF 87 at page 18.

99.   The Lathrop & Gage associate who signed (and presumably drafted) that Motion is not an engineer, is not licensed to practice before the USPTO, and is described by her superiors as not being "an IP litigator", yet she was able to read the Cherdak '445 patent and easily confirm that it does not "only disclose a contact dimple" as VOCK earlier misled the USPTO into falsely believing.

100.  BUT FOR VOCK's intentional and materially false and misleading statements during the USPTO prosecutions of the '146 and '380 patents, he would not have received allowances for his patents in the first place and he would not have been able to keep an array of patent applications pending in the USPTO to the present day merely to rid the marketplace of genuine and meaningful competition.

101.  VOCK's egregious conduct could not be clearer than in the claims of the '380 patent, which recite the very features VOCK argued for when he intentionally and materially committed fraud on the patent office.

102.  VOCK's truncation of quoted language found in the enabling disclosures of the Cherdak '445 and '269 Patents, coupled with the materially false and misleading statements he directly and <u>repeatedly</u> made to the USPTO to win allowance for his '146 and '380 patents so as to make them the roots of a tainted patent portfolio, is clear fraud on the patent office. This is the exact type of inequitable conduct that must render invalid the entire patent portfolio Defendants

---

[14]Lathrop & Gage's less-than-full statements seem to follow the "truncated citation" format followed by Defendant VOCK almost fifteen years ago. Lathrop & Gage attempted to mislead this Court by not fully disclosing the true and accurate specification of numerous switches and other circuit triggering devices (piezoelectric devices, etc.) that could be used in an apparatus to provide an indication (visual or otherwise) related to the time that a shoe is off the ground during a jump or during running which involves a series of jumps.

have enjoyed through unwarranted and unjustified enforcement of invalid patents.

103. PhatRat (at VOCK's direction and control) prosecuted a number of Federal lawsuits, *inter alia,* against NIKE, APPLE, POLAR, FITSENSE, GARMIN and TIMEX Corp. based on invalid, unenforceable patents.

104. VOCK's patents continue to stifle competition in violation of the Sherman and Clayton antitrust acts.

### B. Defendant's Enforcement and Holding Out of Invalid Patents

105. Defendants' fraud on the patent office cannot be overlooked in view of the express enforcement activities engaged in by Defendants to date. The arrogance of Defendant's VOCK and PHATRAT[15] to sue major companies based on knowingly invalid patents procured by fraud on the patent office cannot be ignored in what is supposed to be an open and free marketplace.

106. Since at least as early as mid-2005, PHATRAT (by one name or another) sued several market leaders including Defendants APPLE and NIKE, TIMEX, FITSENSE, POLAR ELECTRO, INC., POLAR ELECTRO OY, GARMIN and TIMEX Corporation for patent infringement based on alleged infringement by such parties of patents which in one way or another all rely on either U.S. Patent 5,636,146 and/or 5,960,380, the original parent patents on which the entirety of VOCK's and PhatRat's ill-gotten patent portfolio rests.

107. For example, PHATRAT sued Defendant APPLE in the U.S. District Court for the District of Colorado (Case No. 1:06-cv-02122-REB-MJW) alleging patent infringement of PhatRat's patents (by way of assignment) including, but not limited to, Patent Nos. 6,499,000

---

[15] At the time PHATRAT sued NIKE and APPLE, VOCK was a partner at the law firm of Lathrop & Gage, where he remains a Partner today. The evidence is clear that Lathrop & Gage was involved in the PHATRAT v. APPLE case by the law firm's payment of court costs on behalf of PHATRAT in that case. **Exhibit 18**.

(bases priority on USP 5,636,146), 6,885,971 (bases priority on USPs 5,636,146 and 5,960,380), 6,963,818 (bases priority on USPs 5,636,146 and 5,960,380), and 7,092,846 (bases priority on 5,960,380).

108.    All such lawsuits were ultimately dismissed, by agreement of the parties, with prejudice, and, on information and belief, resulted in licenses or other rights agreements, or assignments of rights such as from Defendant PHATRAT to Defendants NIKE and APPLE.

109.    Interestingly, Lathrop & Gage was responsible, at least in substantial part, for representing PHATRAT and for prosecuting the aforementioned patents which were the subject of litigation in the PHATRAT v. APPLE case[16].

110.    One of Defendant VOCK's co-inventors, Dr. Shawn E. Burke, is a named co-inventor in U.S. Patent No. 7,092,846 as asserted by PHATRAT against APPLE in the *PhatRat v. Apple* case – a case in which the accused devices alleged of infringement were none-other than NIKE + IPOD products. Dr. Burke has been named by hired by Lathrop & Gage, LLP, VOCK's law firm, as an "expert" in the *Cherdak v. Rack Room Shoes, Inc.* case now pending in this Court. Clearly, Dr. Burke has a significant interest in protecting the alleged validity of the very patents in which he is a named co-inventor and which have been asserted against the likes of APPLE in connection with NIKE+ products. Due discovery in this case will reveal all of Dr.

---

[16] Its also interesting to note that while PHATRAT apparently had retained other counsel to handle certain litigation related tasks, Lathrop & Gage was still very involved and even fronted the money to commence the *PhatRat v. Apple* case in the first place. **Exhibit 18** (Filings Fees Receipt issued by the United States District Court for the District of Colorado evidencing filing fees paid by Lathrop & Gage Check No. 1035 in case no. 06-cv-012122). Accordingly, after due and proper discovery in this case, Plaintiff reserves the right to amend his Complaint by naming Lathrop & Gage as a Defendant and stakeholder in the PHATRAT related litigations and/or in connection with revenues that may still flow to Defendant VOCK and/or Defendant PHATRAT and/or others.

Burke's interest(s) in this or any other case and, therefore, Plaintiff reserves the right to amend his complaint to later name Dr. Burke as a defendant in this action.

111.    The <u>very close</u> relationships between VOCK, Burke, Lathrop & Gage, and PhatRat[17] (co-inventors, consulting experts, counsel to the same parties, etc.), demonstrate that there is no question that VOCK knew of the fraud on the patent office that he committed over his own signatures on several occasions, and the continued fraud on the U.S. District Court for the District of Colorado court when PHATRAT filed suit, *inter alia,* against NIKE, APPLE, TIMEX, GARMIN, FITSENSE and POLAR based on alleged infringement of knowingly invalid patents.

112.    The frauds on the USPTO not only render the '146 and '380 patents invalid *ipso facto*, any patent "in the technology family" and relying on such invalid patents is tainted by the frauds to obtain the root patents in the first place.

113.    VOCK's materially false and misleading statements to the USPTO during pendency of the '146 and '380 were relied upon by the USPTO and, hence, the American People.

114.    VOCK, PHATRAT, and possibly others used their fraudulent and invalid patents to rid the marketplace of meaningful competition.

115.    VOCK and PHATRAT have significantly benefited from the frauds they perpetrated on the USPTO to obtain invalid patents. They have used their ill-gotten patent portfolio to extract considerable fees and/or licenses from entities including, but not limited to,

---

[17] On information and belief, Defendant VOCK, the Boulder Office of Lathrop & Gage, and the offices of Defendant PHATRAT are all located in the same building at 4845 Pearl East Circle Boulder, CO 80301. Defendant VOCK is a named forming member of Defendant PHATRAT Technologies, LLC. **Exhibit 19** (Colorado Business Records Articles of Organization for Defendant PhatRat Technologies, LLC).

NIKE, APPLE, TIMEX, POLAR, GARMIN, FITSENSE in direct contravention of Section 2 of the Sherman Antitrust Act and Section 4 of the Clayton Act.

### C. Defendant's Attempted and Actual Monopolization Through Use of Fraudulently Obtained Patents

#### i. The Relevant Market

116.    NIKE + IPOD products and related technologies and products have been some of the most successful consumer products ever marketed and sold throughout the world.

117.    The success of such product offerings has created a relevant marketplace and a modern phenomenon known as NIKEPLUS.COM, where runners, athletes, and the public in general can learn about new products, buy shoes, clothing, and technologies under the NIKE+ trademark, share information about the activities in which they use their NIKE + IPOD products, virtually compete against each other and share stories about their successes and challenges.

118.    As a result of their extensive marketing, the NIKE + IPOD family of products have become market leaders worldwide.

119.    Defendants have collectively permitted only a limited amount of competition from other marketers who do not possess the sheer numbers of users, products, website facilities, features, technologies and collections of U.S. and foreign patents.

120.    In fact, no other marketers can compete with the ill-gotten, but vast, patent portfolio that was initially pursued by VOCK and PHATRAT and, then later, by NIKE and APPLE.

121.    At the time that VOCK and PHATRAT pursued patent infringement litigation, *inter alia*, against NIKE, APPLE, POLAR, FITSENSE, GARMIN and TIMEX Corp., PHATRAT was the assignee of record of many U.S. and foreign related and intended patent applications/patents.

122.   In the *PhatRat v. Nike* case alone, PhatRat asserted four (4) patents – all directed to personal activity monitoring technologies and which all rely on VOCK's false and material statements to obtain allowances in connection with the '146 and '380 patents in the first place.

123.   VOCK saw Plaintiff Cherdak's patents as huge obstacles in the pursuit of his unfair and anticompetitive trade practices.  Instead of attempting to purchase rights from Cherdak, VOCK chose instead to materially misrepresent the metes and bounds of the Cherdak Patents to the USPTO and to the American People.

### ii. Market Power

124.   Defendants' use of numerous invalid patents to extract revenue from parties in the market (and exclude others from that market) is clear evidence of predatory practices in the market.

125.   To utilize the high costs of litigation to extract royalties based on knowingly invalid patents obtained by fraud is illegal and is clear patent misuse.

126.   By acquiring tens of patents directed to personal activity monitoring technologies by blatantly lying about the prior art (the Cherdak patents) to build a vast, yet invalid, patent portfolio of U.S. and Foreign Patent Rights and then to knowingly assert broad patent claims against market players in Federal Court in the United States is, by definition, exclusionary.

127.   As a result of VOCK's and PHATRAT'S improper, illegal and predatory acts and anticompetitive practices, competitors, including Plaintiff, were not able to enjoy the benefits of the U.S. Patent systems' *quid pro quo*.  In the case of Plaintiff, he has and continues to be injured by VOCK'S and PHATRAT'S predatory practices in the field of patent licensing in which VOCK and PHATRAT directly compete.

128.   Defendants NIKE and APPLE (as a result of their obtaining assignments and/or licenses from PHATRAT and/or VOCK) now enjoy an invalid patent portfolio that, absent Court intervention, will continue to expand and create barriers to entry to new marketers who could otherwise introduce new and innovative products.

129.   VOCK, PHATRAT, NIKE and APPLE, based on VOCK and PHATRAT's fraudulent behavior, have now created a marketplace that is virtually impenetrable so that others cannot effectively compete.

130.   VOCK and PHATRAT have violated Section 2 of the Sherman Antitrust Act by improperly and illegally monopolizing interstate commerce and, in particular, the personal fitness and monitoring marketplace.

131.   Section 4 of the Clayton Act permits Plaintiff to bring this Count and to seek all applicable damages and remedies including, but not limited to, threefold the damages incurred by Plaintiff to date (lost licensing revenue, lost profits, etc.), the cost of suit and reasonable attorney's fees.

## PRAYER FOR RELIEF

*WHEREFORE*, Plaintiff Cherdak prays for judgment and relief against Defendants as follows:

A.   For a judgment that the Cherdak '445 and '269 patents are infringed by

Defendants NIKE and APPLE (including, but not limited to, their subsidiaries, predecessors-in-interest and business units however and wherever formed, etc.) each standing alone and, jointly and severally, as they have and continue to act independently and in concert to bring to market and encourage the infringing use

of products within the NIKE+ product family and the NIKE TRIAX products mentioned herein;

B.      That permanent injunctions be issued against continued infringement of the Cherdak '445 and '269 patents by Defendants NIKE and APPLE and their parents, subsidiaries, officers, directors, employees, affiliates, representatives and agents, and all those acting in concert with or through Defendants, directly or indirectly, including, but not limited to, distributors, customers, and other retailers;

C.      That an accounting be had for damages caused to Plaintiff Cherdak by Defendants NIKE's and APPLE's acts in violation of the U.S. Patent Act (35 USC § 1, et seq.) together with pre-judgment and post-judgment interest;

D.      That any damages awarded in accordance with any prayer for relief be enhanced and, in particular, trebled in accordance with the U.S. Patent Act (35 USC § 1, et seq.) for Defendants NIKE's and APPLE's acts which are found to be willful acts of patent infringement;

E.      That Defendants VOCK and PHATRAT be required to pay treble damages, costs of suit, attorneys' fees and all other due relief required in accordance with Section 4 of the Clayton Antitrust Act (15 U.S.C. Ch. 1, § 15);

F.      That the Court declare the '146 and '380 Patents to Flentov, et al., and all patents relying thereon for priority of invention in whole and/or in part INVALID and UNENFORCEABLE due to INEQUITABLE CONDUCT regardless of ownership of such patents;

G.   That the Court award reasonable attorneys fees and costs incurred by Plaintiff in

bringing and prosecuting this case.

H.   Such other and further relief as this Court shall deem just and proper.

Respectfully submitted,

December 5, 2011

Daniel Sage Ward, VSB 45978
WARD & WARD, PLLC
2020 N Street, N.W.
Washington, D.C. 20036
202-331-8160
202-503-1455 (facsimile)
dan@wardlawdc.com

36